IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No.  22 CR 140 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| KEVIN DIXON. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Kevin Dixon, a convicted felon, fired multiple shots at the driver of a vehicle as he fled a crime scene. He then engaged in a car chase, hitting several cars and injuring civilians. Upon arresting Dixon, law-enforcement agents discovered a Glock firearm with a switch to convert the device into a machine gun. A grand jury indicted Dixon for unlawful possession of an automatic firearm and unlawful possession of a firearm as a convicted felon. Dixon moves to dismiss the indictment, arguing that the charges against him violate the Second Amendment. (Dkt. 56). For the following reasons, the Court denies the motion. (*Id.*)

## BACKGROUND

While attempting to flee a crime scene, Dixon—the driver of the silver Dodge Challenger—fired multiple shots at the driver of another vehicle. (Dkt. 61 at 2). In the ensuing chase, he subsequently struck two additional vehicles, with four people—including two children—inside. (*Id.*) After hitting the third vehicle, Dixon was seen "manipulating something with his hands." (*Id.*) He then exited the car. (*Id.*) Law-enforcement agents gave chase and apprehended him. (*Id.*) Three witnesses confirmed that Dixon was the driver of the Challenger, the vehicle responsible for the three collisions. (*Id.*)

1

Agents later recovered a Glock firearm equipped with a Glock switch on the ground outside of the front driver's side door of Dixon's vehicle. (*Id.* at 2–3). This Glock switch converted the weapon from a semiautomatic to an automatic firearm, allowing the "firearm to be used as a machinegun, firing multiple rounds with a single pull of the trigger." (*Id.*) Nine shell casings were also recovered, and tests confirmed that they matched the firearm recovered outside of Dixon's Challenger. (*Id.*) Gunshot residue on Dixon's left hand also indicated that he fired the Glock out of the Challenger's driver side at the victim. (*Id.*)

A federal grand jury indicted Dixon, who had prior convictions for reckless homicide and mob action, for knowingly possessing a machinegun in violation of 18 U.S.C. § 922(o)(1) and for knowingly possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). (Dkt. 1 at 1–2); (Dkt. 61 at 3). Dixon moves to dismiss both charges, arguing that the Second Amendment protects his conduct. (Dkt. 56 at 1).

## **LEGAL STANDARD**

"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits," Fed. R. Crim. P. 12(b)(1), such as a constitutional violation. *United States v. Holloway*, 74 F.3d 249, 253 (11th Cir. 1996). When considering a motion to dismiss a criminal indictment, the Court assumes all facts are true and views them in the light most favorable to the government. *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010) (per curiam) ("An indictment is reviewed on its face, regardless of the strength or weakness of the government's case.").

**DISCUSSION**

I.  **The Second Amendment**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court recognized the Second Amendment enshrines "the individual right to possess and carry weapons." 554 U.S. 570, 592 (2008). At the same time, "the right secured by the Second Amendment is not unlimited." *Id.* at 626. First, "nothing … should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–67. These laws enjoy a presumption of constitutionality. *Id.* at 627 n.26. Second, the Second Amendment only protects the "sorts of weapons … in common use." *Id.* at 627.

Two years later, in *McDonald v. City of Chicago*, the Court incorporated the Second Amendment right against the states. 561 U.S. 742 (2010). "Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and … is 'the *central component*' of the Second Amendment right." *Id.* (quoting *Heller*, 554 U.S. at 599).

After *Heller*, the lower courts used a two-step approach for analyzing Second Amendment challenges. *Ezell v. City of Chicago*, 846 F.3d 888, 892 (7th Cir. 2017) (*Ezell II*). At step one—the "textual and historical" inquiry— the court asked "whether the regulated activity [fell] within the scope of the Second Amendment." *Id.* If the conduct fell outside of the scope, the analysis ended. *Id.* If not, "then there [was] a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* (internal quotations

omitted). The more severely the law burdened a person's Second Amendment right to possess a weapon for self-defense, the more exacting a court's means-end scrutiny was. *See Wilson v. Cook County*, 937 F.3d 1028, 1032 (7th Cir. 2019). "By contrast, if a challenged law [did] not implicate a core Second Amendment right, or [did] not place a substantial burden on the Second Amendment right," the more lenient intermediate scrutiny applied. *Jackson v. City and County of San Francisco*, 746 F.3d 953, 961 (9th Cir. 2014).

Last year, the Supreme Court rejected the two-step approach in *New York State Rifle & Pistol Association, Inc. v. Bruen*. 142 S. Ct. 2111, 2126 (2022). Two steps were "one step too many." *Id.* at 2127. Instead, the appropriate inquiry begins with the text. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. If the conduct is presumptively protected, the government then has the burden to demonstrate that the challenged law is "consistent with this Nation's historical tradition of firearm regulation." *Id.* In other words, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. This "historical inquiry" requires courts to "reason[ ] by analogy." *Id.* at 2132. When the regulation at issue "addresses a general societal problem that has persisted since the 18th century," the inquiry is a "straightforward" comparison of how similarly the regulation addresses the historical issue. *Id.* But when the law regulates "unprecedented societal concerns or dramatic technological changes," a more "nuanced approach" is required. *Id.* at 2132. A "modern-day regulation" need not be "a dead ringer for historical precursors," just sufficiently "analogous enough to pass constitutional muster." *Id.* at 2133.

II. **Challenged Statutes**

A. **18 U.S.C. § 922(o)(1)**

The Supreme Court held in a pre-*Heller* decision, *United States v. Miller*, 307 U.S. 174 (1939), that the Second Amendment does not protect the right to own a "dangerous and unusual" weapon, such as a machine gun. And *Heller* and *Bruen* both reaffirmed *Miller*'s holding.

*Miller* involved a challenge to the National Firearms Act of 1934, which regulated sawed-off shotguns and machine guns, the favorite weapons of organized crime. 307 U.S. at 175. The two defendants, who transported sawed-off shotguns from Oklahoma to Arkansas, argued the Second Amendment protected their conduct. *Id.* The Supreme Court unanimously disagreed. *See generally id.* The possession of a shotgun had no "reasonable relationship" to the "right to keep and bear" arms. *Id.* at 178. The "language employed" in the Second Amendment might lead to "somewhat variant conclusions concerning the scope of the right guaranteed," but no matter the disagreements, "none of them [] afford[ed] any material support for" the defendants' argument. *Id.* at 182.

*Heller* expressly adopted *Miller*'s holding. The Court devoted an entire section to explaining that none of its "precedents foreclose[d] the conclusions … reached about the meaning of the Second Amendment." *Heller*, 554 U.S. at 619. *Miller* turned on "the *type of weapon at issue*." *Id.* (quoting *Miller*, 307 U.S. at 178). The case "stands [] for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons." *Id.* at 623. It would be a "startling reading" of *Miller* to suggest that the "the National Firearms Act's restrictions on machineguns … might be unconstitutional." *Id.* at 624; *see also Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015) ("The Court took from *Miller* the rule that the Second Amendment does not authorize private persons to possess weapons such as machine guns and

5

sawed-off shotguns that the government would not expect (or allow) citizens to bring with them when the militia is called to service.").

And *Bruen* is consistent with *Miller*. The law at issue was New York's proper-cause requirement for carrying a handgun outside the home. *Bruen*, 142 S. Ct. at 2122. In rejecting the lower court's two-step approach, the Court relied heavily on *Heller*. *Id.* at 2127–28. The text of the Second Amendment, it explained, "protects the possession and use of weapons that are in *common use at the time*." *Id.* (quoting *Heller*, 554 U.S. at 627) (emphasis added) (cleaned up). The challengers sought to carry weapons "in common use" in public, so their conduct was protected. *Id.* at 2134–35. But that same protection would not extend to dangerous and unusual weapons.

Two of the concurring opinions in *Bruen* made the point even more forcefully. Writing for himself, Justice Alito emphasized there were no questions about other "restrictions that may be imposed on the possession or carrying of guns." *Id.* at 2157 (Alito, J., concurring). "Our holding," he reiterated, "decides nothing … about the kinds of weapons that people may possess." *Id.* Justice Kavanaugh, joined by Chief Justice Roberts, added,

> We [] recognize [an] important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those in common use at the time. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons.

*Id.* at 2162 (quoting *Heller*, 554 U.S. at 626–27) (Kavanaugh, J., concurring).

Thus, *Miller*, *Heller*, and *Bruen* foreclose any challenge to the federal machinegun ban. The Second Amendment simply does not extend to "dangerous and unusual weapons." *See, e.g.*, *Heller*, 554 U.S. at 624; *Miller*, 307 U.S. at 182; *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d 136, 143 (3d Cir. 2016) ("[T]he Second Amendment does not protect the possession of machine guns. They are not in common use for lawful purposes."); *United States v. Fincher*, 538 F.3d 868, 874 (8th

Cir. 2008) ("Machine guns are not in common use by law-abiding citizens for lawful purposes"); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) ("*Heller* did not specify the types of weapons that qualify as 'dangerous and unusual,' but the Court stated that it would be 'startling' for the Second Amendment to protect machine guns.") (citation omitted).

### B. 18 U.S.C. § 922(g)(1)

Dixon's claim that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him is similarly misguided. The Second Amendment's text presumptively excludes felons. *Heller* 554 U.S. at 626–27. Moreover, the historical tradition supports prohibitions on their possession of firearms. *Bruen*, 142 S. Ct. at 2126.

The "people" of the Second Amendment are not dangerous felons. U.S. Const. amend. II. *Heller* says as much. *See* 554 U.S. at 625. After thoroughly examining the Second Amendment's text, history, and tradition, the Supreme Court concluded its protection only extends to "*law-abiding* citizens" using weapons "for lawful purposes," as the right to bear arms "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 625, 635 (emphasis added); *see also id.* at 635 ("Assuming that [respondent] is not disqualified from the exercise of Second Amendment rights ….."). The qualification on who are the "people" exemplifies why "the right secured by the Second Amendment is not unlimited." *Id.* at 626. As such, "nothing … should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons."[1] *Id.* at 626; *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting) ("*Heller*'s reference endorses the proposition that the legislature can

---

[1] Although Dixon correctly observes that the Seventh Circuit described this language as "dictum," it still relied on this dictum to uphold § 922(g)(1)'s constitutionality. *United States v. Williams*, 616 F.3d 685, 691 (7th Cir. 2010) (citation omitted); *see also id.* ("The district court denied the motion, relying on *Heller*'s now-famous dictum that 'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill….' We affirm."). And only two years later, in *McDonald*, the Court "'repeat[ed] [its] assurances' that Heller's dictum regarding disqualifications on firearm possession by felons was valid." *Id.* at 692 (quoting *McDonald*, 103 S. Ct. at 3047 (plurality opinion)).

impose some categorical bans on the possession of firearms.")); *cf. Heller*, 554 U.S. at 627 n.26 ("We identify these presumptively lawful regulatory measures only as examples ….").

*Bruen* repeated *Heller*'s conclusion that the Second Amendment applies only to law-abiding citizens over ten times.[2] *See, e.g.*, *Bruen*, 142 S. Ct. at 2132–33 ("While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a *law-abiding citizen's* right to armed self-defense.") And in ruling for the applicants seeking gun licenses, the Court explained that they fell within "the people" contemplated by the Second Amendment because they were "ordinary, law-abiding, adult citizens." *Id.* at 2134.

Again, the *Bruen* concurrences prove helpful. Justice Alito emphasized that "[o]ur holding decides nothing about who may lawfully possess a firearm" and that "we [have not] disturbed anything that we said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 2157 (Alito, J., concurring). Justice Kavanaugh, joined by Chief Justice Roberts, echoed this sentiment. "[A]ll that we decide in this case is that the Second Amendment protects the right of *law-abiding people* to carry a gun outside the home for self-defense." *Id.* at 2159 (Kavanaugh, J., concurring) (emphasis added). Nothing more. The instruction from *Heller* then—that "nothing" casts doubt on longstanding prohibitions on the possession of firearms by felons—remains in full effect. *Id.* (quoting *Heller*, 554 U.S. at 626).

---

[2] Prior to *Bruen*, the Seventh Circuit's debate about § 922(g)(1)'s constitutionality centered on challenges from nonviolent felons. *See, e.g.*, *Williams*, 616 F.3d at 693 (7th Cir. 2010) ("[W]e recognize that § 922(g)(1) may be subject to an overbreadth challenge at some point because of its disqualification of all felons, including those who are non-violent…"). It never, though, suggested that violent felons have a constitutional right to own a gun. *Medina*, 913 F.3d at 160 ("Whether a certain crime removes one from the category of 'law-abiding and responsible,' in some cases, may be a close question .... Those who commit felonies, however, cannot profit from our recognition of such borderline cases." (cleaned up)).

8

Assuming, though, the Second Amendment's plain text did cover Dixon's conduct, regulating the possession of firearms by violent felons is part of the nation's historical tradition.[3] *Id.* at 2126. Keeping guns out of the hands of dangerous individuals is not a new phenomenon. In 18th century England, one "arousing 'suspicion of an intention to commit any act of violence or disturbance of the peace'" was often prohibited from possessing a firearm. C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 716 (2009). Colonial Americans then continued the English tradition of disarming those "perceived as dangerous." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arm*, 20 Wyo. L. Rev. 249, 262 (2020). "Like English laws, colonial laws were sometimes discriminatory and overbroad—but even those were intended to prevent danger." *Id.* Regulations that prevent dangerous individuals from acquiring or owning firearms, thus, align with how "the founders thought the legislature should decide which groups pose a threat to the social order or the community." Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1586 (2022). Although some laws did not use the word "felon" and instead focused on dangerousness or virtue, as *Bruen* notes, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 142 S. Ct. at 2133.

---

[3] Although some courts have suggested the Second Amendment protects certain nonviolent felons, *Heller v. District of Columbia,* 670 F.3d 1244, 1253 (D.C. Cir. 2011) (*Heller II*), even this proposition is contested. *See, e.g.*, Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 203, 266 (1983) ("Nor does it seem that the Founders considered felons within the common law right to arms or intended to confer any such right upon them."); Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 Okla. L. Rev. 65, 96 (1983) ("Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded … felons."). This Court need not consider the more difficult questions presented by nonviolent felons because Dixon committed an unquestionably violent felony. *See Whitehouse v. Ill. Cent. R. Co.*, 349 U.S. 366, 372–73 (1955) ("[Courts should] observe the wise limitations on our function and [] confine ourselves to deciding only what is necessary to the disposition of the immediate case.).

Seventh Circuit caselaw reinforces this understanding of American history and tradition. In *United States v. Skoien*, the Court pointed to an early report that asserted "citizens have a personal right to bear arms 'unless for crimes committed, or real danger of public injury.'" 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing Bernard Schwartz, 2 *The Bill of Rights: A Documentary History* 662, 665 (1971)). In *United States v. Yancey*, the Court reasoned that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" 621 F.3d 681, 684–85 (7th Cir. 2010) (citation omitted). Finally, dissenting in *Kanter v. Barr*, then-Judge Barrett noted that "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." 919 F.3d at 451 (Barrett, J., dissenting).

Other circuits have reached the same conclusion. *See, e.g.*, *Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336, 349 (3d Cir. 2016) ("The view that anyone who commits a serious crime loses the right to keep and bear arms dates back to our founding era."); *Frein v. Pa. St. Police*, 47 F.4th 247, 255 (2022) ("The seeds of the Second Amendment were planted centuries ago in England, when King Charles II authorized his officers 'to search for and seize all Arms in the custody or possession of any person' whom they considered dangerous'") (citation omitted); *United States v. Chovan*, 735 F.3d 1127, 1145 (9th Cir. 2013) (Bea, J., concurring) ("[F]elon disqualification from the scope of the Second Amendment makes sense from an historical perspective."); *cf. United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) ("[F]elons are categorically different from the individuals who have a fundamental right to bear arms.").

Dixon's claim that § 922(g)(1) is unconstitutional as applied to him only weakens his case. Dixon has two prior convictions for violent crimes: reckless homicide and mob action. Both

felonies indicate a propensity for violence and a corresponding risk of future harm, the exact harm that early colonial laws sought to avoid.

## **CONCLUSION**

For these reasons, the Court denies Dixon's Motion to Dismiss. (Dkt. 56).

                                                                                                                                _____
                                                                                                                                Virginia M. Kendall
                                                                                                                                United States District Judge

Date: March 28, 2023