**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 22 CR 140 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| KEVIN DIXON. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Lansing police officers arrested Defendant Kevin Dixon after he crashed his Dodge Charger into several cars at a street intersection. Shortly after his arrest, officers asked witnesses and victims of the crash to identify Dixon in a show-up procedure. Dixon now moves to suppress the out-of-court identifications from four witnesses, arguing the show-up procedure was impermissibly suggestive and the testimonies were unreliable. (Dkt. 70).[1] For the following reasons, Dixon's motion to suppress is denied.

## BACKGROUND

On June 6, 2021, Officer Kulacz responded to a dispatch call regarding a hit-and-run collision involving a silver Dodge Charger. (Dkt. 75 at 2–3). Upon arriving at 182nd Street and Paxton Avenue, Officer Kulacz saw the suspect driving a silver Dodge Charger heading east and pursued the Charger to the intersection of Ridge Road and Torrence Avenue. (*Id.* at 3; Dkt. 75-1 at 2). There, the Charger drove through a red traffic light and collided with a gray Jeep driven by Victim 3 and a blue Jeep driven by Victim 4.[2] (Dkt. 75 at 2–3). The Charger's driver proceeded to

---

[1] Dixon's motion to suppress statements made after his arrest [69] is denied as moot because the government does not intend to introduce Dixon's statements as evidence. (*See* Dkt. 75 at 2).

[2] The Court adopts the government's witness labels.

flee from the crash, and Officer Kulacz followed the suspect and placed him under arrest. (*Id.*; Dkt. 75-1 at 2).

The out-of-court identification concerns stem from four individuals: Victim 3, Victim 4, Witness 1, and Witness 2. Starting with Victim 4, he was driving his blue Jeep when the Charger crashed into his car, causing it to spin. (Dkt. 75 at 5–6). When the police arrived on site, Officer Tomaszewski spoke to Victim 4 and commented about how the suspect likely did not have insurance, was driving a stolen car, and not an upstanding citizen. (*Id.* at 6). When asked if he had an opportunity to see the suspect, Victim 4 responded that he remembered seeing his shirt and commented that the suspect was a black male between the ages of 20 and 35. (*Id.* at 7). Officer Tomaszewski proceeded to take Victim 4 to the rear part of a building for a show-up. (*Id.*) Along the way, Officer Tomaszewski said that the police captured an individual and asked Victim 4 if the suspect was the individual standing next to police officers. (*Id.* at 7–8). Victim 4 answered affirmatively, stating that he saw the suspect and the shirt he was wearing when he ran along the side of Victim 4's Jeep. (*Id.*) Victim 4 proceeded to walk a bit closer to the suspect before stopping. (*Id.* at 8). He again confirmed the suspect's identity. (*Id.*)

Witness 2 witnessed the incident as a bystander. He saw the suspect flee the crash towards the back of the Lansing Cleaner's building. (*Id.* at 6). He asked Officer Tomaszewski if the suspect was apprehended, and Officer Tomaszewski replied that the police had a suspect. (*Id.* at 5). After Victim 4 came back from the show-up, Officer Tomaszewski took Witness 2 to the building rear where the suspect was held. (*Id.* at 9). As Witness 2 relayed what he saw, Officer Tomaszewski stated that there was little doubt and the show-up was just procedure. (*Id.*) Officer Tomaszewski again commented how the suspect may not have insurance. (*Id.*) Upon arriving at the back of the

building, Officer Tomaszewski pointed to the location of the suspect and Witness 2 affirmatively identified him. (*Id.*)

The Dodge Charger crashed into Victim 4's Jeep first and then careened into Victim 3's car. (Dkt. 90 at 73:10–12). Victim 3 saw the suspect get out of the Charger and dig around in his car before fleeing the crash site. (Dkt. 75 at 7). She testified that she had a clear view of his face as she was only a few feet away from the driver. (Dkt. 90 at 75:6–15, 76:3–5). Victim 3 further testified that the suspect had short-cropped hair and wore gray clothes and underwear with distinctive red, pink, and green Hawaiian print. (*Id.* at 76:8–13). Victim 3 recalled she was talking to only one officer while other police officers were talking to other victims and witnesses. (*Id.* at 87:12–23). But she did not overhear all of their conversations. (*Id.* at 87:18–23). When asked if she could identify the driver, Victim 3 indicated yes because the suspect was only a few feet away from her. (Dkt. 75 at 4). Instead of walking with Officer Tomaszewski to the back of the building for the show-up, Victim 3 got into a car with Witness 1 and Sergeant Winkler. (*Id.* at 8–9). Sergeant Winkler drove them past the suspect and asked them to determine whether the individual the police had was the same individual they had seen. (*Id.*) Victim 3 had a clear view of the suspect and responded affirmatively. (*Id.* at 9; Dkt. 90 at 79:11–13).

Witness 1 also witnessed the incident as a bystander. She was sitting in her car at the intersection when she saw the Dodge Charger drive through the light and strike a blue Jeep. (Dkt. 75 at 5). She testified that there was only one occupant in the car, and a man jumped out of the driver's seat. (Dkt. 90 at 49:4–6). She described the suspect as a young black man, possibly wearing gray shorts. (*Id.* at 50:24–51:8). As the suspect was turning to run away, Witness 1 was able to see his front side. (*Id.* at 65:3–6). Witness 1 got into a car along with Victim 3 to participate in the show-up. (Dkt. 75 at 8–9). Witness 1 had a clear view of the individual in custody and

3

Sergeant Winkler asked if he was the same individual driving the Dodge Charger. (*Id.*; Dkt. 90 at 52:22–53:1). Witness 1 responded affirmatively. (Dkt. 75 at 8–9).

## DISCUSSION

To succeed on a motion to suppress identification testimony, a defendant has to show that the identification procedure employed was unreasonably suggestive. *United States v. Funches*, 84 F.3d 249, 253 (7th Cir. 1996). "If the defendant succeeds, the court must determine 'whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedures.'" *Id*. (quoting *Kubat v. Thieret*, 867 F.2d 351, 357 (7th Cir. 1989). "[T]he primary evil to be avoided is a very substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 198 (1972) (internal citation omitted). Dixon argues that all four witness testimonies should be suppressed because the show-up procedure was unduly suggestive and none of the witnesses' testimonies are reliable. The Court agrees with Dixon that the show-up procedure was impermissibly suggestive for all four witnesses. Nevertheless, the out-of-court identifications are still reliable to satisfy due process. Therefore, the testimonies can be admitted as evidence.

## I.     Show-up Procedure

A show-up procedure is when only one suspect is presented to a witness. *Funches*, 84 F.3d at 254. The procedure has "been widely condemned because of their potential to render unreliable, mistaken identifications." *Id.* "A show-up is inherently suggestive because the witness is likely to be influenced by the fact that the police appear to believe the person brought in is guilty, since presumably the police would not bring in someone that they did not suspect had committed the crime." *Id.* But there are situations where show-ups are appropriate, such as allowing identification before "the suspect has altered his appearance and while the witness' memory is fresh, and permit the quick release of innocent persons." *Id.* (quoting *United States v. Sleet*, 54 F.3d 303, 309 (7th

Cir. 1995)). Absent such exigent circumstances, there is no reason a less suggestive identification process, like a line-up with multiple individuals, could not be arranged. *See Funches*, 84 F.3d at 254.

Here, the government concedes that Officer Tomaszewski's comments to Victim 4 and Witness 2 were unnecessarily suggestive and tainted the show-up procedure. (Dkt. 75 at 15). But the government argues that the procedure for Victim 3 and Witness 1 was free from such contamination. Dixon casts doubts on the government's position by arguing that Victim 3 and Witness 1 overheard impermissibly suggestive remarks prior to their show-up. The government disputes the extent Victim 3 and Witness 1 overheard these comments, but in focusing on the minutia, the government misses the problematic larger picture—there was no exigent circumstance to justify a show-up procedure. The government relies on Sergeant Winkler's statement that the procedure was necessary to avoid arresting the wrong individual, but his comment plays more as a justification for show-up procedures generally—not the situation at hand. According to Officer Kulacz's report, Officer Kulacz saw the suspect as the Charger drove past Officer Kulacz's car. (Dkt. 75-1 at 2). Officer Kulacz saw the Charger had collided with vehicles in the intersection and noticed the suspect fleeing from the crash to a Damage Auto parking lot. (*Id.*) Officer Kulacz "followed the suspect and [he] exited [his] squad car and ordered the suspect to the ground." (*Id.*) There is nothing on record to suggest that Officer Kulacz lost sight of the suspect at any point after the crash. There were no crowds for the suspect to blend into and hide. In other words, there was a high degree of certainty that the individual arrested was the same individual involved in the car crash. *Cf. United States v. Hawkins*, 499 F.3d 703, 708 (7th Cir. 2007) (commenting that a show-up is an appropriate method to determine whether the police's investigation is on the right track and they are pursuing the correct suspect).

Furthermore, there was no risk of losing any witness testimony. Approximately 30 to 45 minutes after the crash, the witnesses were escorted to the police station for additional interviews. (*See* Dkt. 90 at 80:16–24). The police could have conducted a formal multi-suspect physical or photograph line up then. But instead, all four witnesses were presented a handcuffed Dixon, outside an officer's squad car, surrounded by at least two police officers. No doubt this image conveyed an unduly suggestive message of guilt. Altogether, the show-up was conducted out of simple convenience, not extraordinary urgency, because there was enough evidence against Dixon to render such an expedited identification unnecessary. *See United States v. Newman*, 144 F.3d 531, 535 (7th Cir. 1998).

## II.    Reliability

Still, even with the first condition satisfied, the Court finds each witness's testimony reliable under the totality of the circumstances. The Supreme Court has identified several factors that bear on the reliability of identifications: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. *Biggers*, 409 U.S. at 199–200.

First, all four witnesses had an opportunity to view the suspect. The crash occurred in daylight with clear visibility. None of the witnesses mentioned any obstructions that blocked their line of sight of Dixon. Witness 1 and 2 were not involved in the accident and witnessed the entire accident as bystanders. Victim 3 testified that the suspect was only a few feet away from her and she had a clear view of his face. Similarly, Victim 4's identification was also made from close-up as he described the suspect running past the side of his car to flee. Dixon contends that the entire incident unfolded quickly and at best, the witnesses only had a few seconds to see the suspect's

appearance. But a few seconds are enough. *See United States v. Zolicoffer*, 92 F.3d 512, 516 (7th Cir. 1996) (stating there is no cut-off mark beyond which a viewing is too brief to be reliable); *Walton v. Lane*, 852 F.2d 268, 273 (7th Cir. 1988) (explaining the time of actual exposure to suspect's face is less critical if the crime occurred in broad daylight under ideal situations for making an identification); *U.S. ex rel. Kosik v. Napoli*, 814 F.2d 1151, 1154, 1157 (7th Cir. 1987) (determining identification reliable when witnesses observed the defendant for a few seconds at night under a well-lit street lamp); *United States v. Cox*, 428 F.2d 683, 685–86 (7th Cir. 1970) (observing reliability where witness saw the suspect for a period of several seconds under "good visibility" at a distance of 45 to 60 feet). As such, the Court finds this factor weighs in favor of reliability.

Second, the witnesses had every reason to train their attention on the car collision and its perpetrator. Again, Witness 1 and 2 were not involved in the accident. They saw a Dodge Charger speeding through a red light and colliding with several vehicles. Their attention would naturally focus on the cause of the entire accident—the suspect. While Victim 3 and 4 were involved in the accident, there is no evidence to suggest that their attention or focus was impaired. As shown on Officer Tomaszewski's body camera, both individuals did not suffer any apparent injuries and were able to effectively communicate what they witnessed to the police officers. Victim 4 saw the suspect and remembered the shirt he was wearing and in what direction he ran. Victim 3 later testified with specific details on the suspect's clothes, including his underwear, and his hairstyle. Dixon attempts to cast doubt on the witnesses' focus by arguing that they have either been involved in or witnessed a car accident and such a jarring experience would impact a person's degree of attention. But Dixon's argument is speculation. Simply because a person's attention could be impacted does not mean that it was impacted. Contrarily, the witnesses' statements suggest that

their focus was on the suspect as he was fleeing the scene. Furthermore, courts have found the dramatic nature of a crime could just as easily focus a witness's attention. *See Walton*, 852 F.2d at 273–74. Therefore, this factor also supports the reliability of the identifications.

The third factor is the accuracy of the witness's statement prior to the show-up. The government argues that all four witnesses provided a relatively accurate description of the suspect—a young black male wearing gray clothes. But, as Dixon notes, all but one witness provided descriptions *after* the show-up. Except for Victim 4, there is no evidence of police officers requesting witness statements about the suspect's appearance *before* the show-up. Furthermore, Victim 4's description of the suspect—the fact that Victim 4 saw his shirt and said the suspect was a young, black man—leaves a lot to be desired. *See, e.g.*, *Funches*, 84 F.3d at 255 (providing a close approximation of the robber's height and weight); *Sleet*, 54 F.3d at 310 (accurately describing the defendant's height and weight and the color of his shoes); *Newman*, 144 F.3d at 536 (describing the robber as "an older black man with a long thin face" wearing "dark-warm up jacket and pants, dirty white tennis shoes, and dark blue duffle bag"). But that is not to say that this factor weighs against reliability. There is a difference between not providing a statement at all and providing an inaccurate one. The witnesses could have provided accurate descriptions of the suspect if their statements were taken before the show-up. But there is no such evidence in the record. Thus, this factor does not play a role in determining reliability here.

The fourth factor discusses the level of certainty in the witnesses' identification. The Court is mindful that "the most certain witnesses are not invariably the most reliable witnesses," since their certainty may result from the suggestive procedure. *United States v. Clark*, 989 F.2d 1490, 1495 (7th Cir. 1993) (quoting *Rodriguez v. Young*, 906 F.2d 1153, 1163 (7th Cir. 1990)). As

discussed, the show-up procedure was impermissibly suggestive. Still, all four witnesses were certain in their identification of the suspect. Therefore, this factor is a draw.

Lastly, the time between the car crash and the show-up procedure was short. The elapsed time was less than an hour and the Seventh Circuit has found identifications reliable despite greater lapses of time. *Clark*, 989 F.2d at 1497 (collecting cases). Therefore, the Court finds the time factor to support reliability.

In considering the totality of the circumstances, the Court finds sufficient indicia that the witnesses' identifications are reliable. Consequently, any future in-court identification will not be suppressed. *See Cossel v. Miller*, 229 F.3d 649, 655 (7th Cir. 2000); *United States v. Gonzalez*, No. 13 CR 50074-1, 2015 WL 13891288, at *9 (N.D. Ill. Mar. 31, 2015). Of course, these testimonies are not without some flaws or imperfections, but these are issues for the jury to decide in weighing their ultimate accuracy and reliability. *See Perry v. New Hampshire*, 565 U.S. 228, 245 (2012) (holding that it is for the jury, not the judge, to determine the reliability of eyewitness testimony); *Manson v. Brathwaite*, 432 U.S. 98, 116, (1977) ("[E]vidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.");

*Rodriguez*, 906 F.2d at 1164 (noting that although a witness's identification was admissible, its accuracy was a question for the finder of fact).

## **CONCLUSION**

For the foregoing reasons, the Dixon's motion to suppress [70] is denied.

_____
Virginia M. Kendall
United States District Judge

Date: November 8, 2023